Good morning, ladies and gentlemen. Welcome to a session of the Federal Circuit. We originally had four argued cases for today. One has gone submitted and the other settled at the last minute. So you are down to two cases, but there's a lot to talk about. The first case before the court is Grandeye Limited v. Google Inc. It is an appeal from the Patent Trial and Appeal Board. The claims of three separate patents were deemed to be unpatentable or deemed to be anticipated and or obvious over certain prior art references. And the appellee challenges that finding. So Mr. Chau, I understand that you want to save five minutes for rebuttal? You may begin. Good morning, Your Honor, and may it please the court. I just wanted to follow up on the two technologies at stake here and put in context both the two substantive issues and the procedural issues here. The first is the OXO patents. And the OXO patents really are directed towards the visualization of what he called full surround image data, which we'll call FSID. And the full surround image data that he disclosed was a fisheye image, hemispherical image. Mr. Chau, I view this as an opportunity to get some questions answered, some specifics. In the red brief at 35, Google says, I'm going to quote for you, Grandeye now suggests in passing that it raised the issue of whether ray casting is texture mapping of FSID in its response. But the cited pages A339 to 340 reveal no such thing. I looked at 339 to 340 in the appendix and I couldn't find it. What specific language there shows the issue was raised? Well, the issue was raised in that, well, let me say that it's not clear that's the particular issue. The issue that's raised in the response had been that there was no texture mapping by projection of full surround image data. So the issue here was really that as I was going to explain, the photo VR doesn't actually... I understand the issue. Let me get into my question. You cite 339 to 340. Where do you raise it there? So 338, it says specifically we argued that we did not, full VR did not texture map FSID onto a piece of a substantial equivalent to projecting the image data. In that sense, basically Google has raised the argument that this was... Google has never actually said where the texture mapping happens. You never raised that as an issue. Your issue was what was the construction for full surround image data. Whether or not you didn't address when texture matching occurs in terms of the structure of the technology. So you never said before the hearing that, oh, by the way, even if this is full surround image data, the texture matching has to occur at a particular point in time. What we argued there based upon the FSID was that there was no FSID being projected as a... if that's the version of texture mapping. Let's talk about your claim construction argument. You say that you don't like the board's claim construction because it's too vague. The board says that it took its construction straight out of the spec. This is one of those unusual cases where the board felt that there was an explicit definition in your written description. So what claim construction are you actually asking us to substitute? Your Honor, I think that at this point if we could rewrite things, that's one thing. The board basically shut down our arguments that either or. The argument is basically... Just give me a response. So what claim construction is appropriate? It would be appropriate to say that the sampling that's described in the first sentence of definition four has to be modified somehow. It just can't be any sampling. Well, the board did modify its construction to put the word single in there. No, but that's not what determines what is sampling. In other words, a sample for example, a sample could be one flat image and we all agree that that's not FSID. Okay, but I still... I actually have to say, I don't think I've ever seen an appeal where there's an objection to claim construction where an alternative construction is not proposed. Your Honor, we did propose one and basically the board did not allow us to proceed with it because... Well, is that the one you're saying now should have been the correct one? I'm saying that a modified version of that should have been... Well, what's the modification? The modification is to take out the reference to definition 11, which was the standard 3G computer, 3D computer. Let me... I don't follow that at all. I mean, this is the problem with most of your brief. It doesn't... It refers to a lot of things like definition three or definition 11. If I may address the issue. You were talking previously about sampling. Yes. And you think that has to be modified somehow. How does that have to be modified? It has to be modified with the last sentence of the... No, don't tell me it has to be modified with the last sentence of something... It's modified... Because it's not open. Tell me what you think it should say. It has to be sampling that enables the use of an independent interactive system. Enables, not requiring the use of one, but enables the use. The use of one has to allow two things. One has to allow simultaneous viewing of the full surround image data that's been texture mapped onto this intermediate software object called the p-surface, texture mapped p-surface. And two, it has to be enough to make someone think that they're there. So they can pan around... What's enough? Enough is that it's a perspective correct and there's no discontinuities. It sounds pretty indefinite to me. What we're left with is that sampling, left as it is, has no limitation. This is not the one that you originally proposed, right? This is something different. I'm not quite sure what it is, but it's different than what you originally proposed. No, it's essentially the same thing. There's a paraphrase from definition 10 and definition 11. You were incorporating other definitions into this definition? Because definition 4 says it enables what's in definition 11. What do we do with the language from the hearing transcript where the board asked you if you were walking away from that construction and you said that you were? Because the judge would not let me maintain definition 10 and had to say it was either or. I couldn't do one or the other. The board later on suggested that it consider this, but the reality is that it considered one part of definition 10 and spent about six pages with Google, but never asked me about the same thing. I would have given a different answer, of course, but I would also have talked about the importance of perspective correctness. It never asked you about application 10? No. I've got the transcript right here. The board said, I don't see how you get around it. It says you're trying to carve it out. That's your construction of full surround image data and there are problems with it. You say, okay, I guess, well then the application still of what the first two sentences and he said the first two sentences is what the board had and they've come around to saying, so he said, so you drop your proposed interpretation and you said yes. Yes, I was forced. You were forced to? Because he said that I couldn't maintain the, I couldn't give an intermediate one. Show me in the spec anything that supports your, I'm not even sure what the construction is, but the addition of these. Let's take What's convenient is if I look at A136 so on the left hand column, column 5, it says full surround image data. Line. Okay, line 42 so it's testing the full surround image data. It said that this full surround image data enables Isn't that exactly the construction the board adopted? No, it isn't. This data encodes explicitly or implicitly the association of a color value with a given direction finishing that. That sentence is what the board's construction is. Right, but what that leaves open is what kind of sample we're talking about. A sample of three rays in one direction a single image which doesn't really, isn't a full surround image data single linear image. I mean, so you're relying on the next sentence in that that says full surround image data is useful in fields of that kind of exemplary stuff we almost never take as a limiting construction, do we? No, but I'm not saying that that's limiting it says it's useful because it enables it almost enables is a qualification for the sampling and that's mainly an argument. That was something I was never able to argue because I was cut off. Is that part of your due process argument? Yes, the two parts of the due process argument in a sense I was cut off there actually at the beginning of the hearing it was said that the board's construction was not was still open and then at this point I was given either or. Let me back up a little bit because I'm not sure I completely understand what your due process argument but you got, when the board instituted it put its claim construction forward, right? And you had a chance to respond in writing, didn't you? Yes. And you did and then you had an opportunity to be heard. I think that what the hearing due process is a combination of notice and fairness of the hearing. Right, so you agree you had notice of the board's claim construction. That's correct. And you had an opportunity to respond in writing to that. Yes, once and then. Does due process require more than one opportunity to respond? So your objection then is on the hearing but does the hearing have to allow you to make a further response or just to be heard on your arguments? I think there's a fairness issue there and the question is how the questions are set out because the board itself Why is it unfair for the board to require you to put your objections to its claim construction in writing before the hearing? Well we did object to it by saying that sampling had to be qualified. Basically the core of your two page due process argument is that you disagree with a ruling by the board. No, your honor. The other aspect of it is the refusal to allow us on the so-called intermediate result. Why didn't you put that intermediate result into your response to the board's proposed claim construction? Because it wasn't raised to that issue. Well it's your obligation to respond to the board's proposed claim construction with what you think is the proper claim construction. You did, they disagreed with it and then you waived any further challenge. Excuse me, I'm sorry. I'm mistaking. This intermediate is another factor, not just the intermediate construction. I was speaking about the idea of where is the FSID and Google made in its reply, which is after we could make any other evidentiary connection, made an argument that it was maintained somehow. If actually one looks at the photo of the artist, nothing indicates it's maintained. Your approach seems to be sort of codified or kernelized by page 15 of your reply brief on where you submit something called supplementation of argument. Our rules don't provide for that. Do you think it's a violation of due process for us not to consider it? Supplementation of argument is the reply, isn't it? No, a reply is a reply to an opposition. You have a brief, an opening brief, you have a response and then you have a reply to the response. Your Honor, I suppose I mislabeled it. It's a reply. You had a separate section of your reply brief in which you raised new matters. I don't believe I do. Your time is completely up. We'll restore your five minutes for rebuttal. We'll give an extra five minutes. How do you want to divide that up? Okay, we'll give it to Mr. Schopp. Mr. Helm is happy not to stand up for too long. May it please the Court, Pratik Schopp for Apple eGoogle Inc. Grandi's argument against the Board's construction of full surround image data and its argument against the Board's finding that PhotoVR discloses texture mapping of full surround image data both come too late. Under established principles, Grandi was not permitted to change its claim construction or advance new distinctions of the prior art at the IPR hearing for the first time after. I'm interested in the fact that we've got about three claim constructions here, maybe more if Google didn't think that the Board's claim construction was the correct claim construction at least not initially, right? Your Honor, that's true in the sense that Google also provided other language that the Board rejected. Google does not press those on appeal because we went under on both anticipation and obviousness grounds on the construction that the Board adopted and we agree with the construction that the Board adopted to the extent it incorporated verbatim, essentially, it added the word single, but otherwise incorporated verbatim the definition from the specification. But why is it that Google initially thought that additional language was necessary to clarify the construction? It was just out of clarification to give some content to full surround image data. We don't think it actually would have materially changed the scope of the claims. Our anticipation arguments, for example, remain identical under both the language that we proffered, the omnidirectional language that we originally proffered, and the current construction. It was more out of full surround image data to give some context to what that is. We suggested the omnidirectional language initially. The Board said, no, we're going to go with the verbatim definition from the specification. We agree with that. We don't think that that materially changes anything. We're happy to go with the Board's definition and we made our anticipation argument, of course. The Board offered its initial construction in its institution decision. We then made our anticipation arguments based upon the Board's construction. And we made alternative arguments but we don't need to press those. We're happy to stick with the Board's construction. And that construction, Your Honor, even putting aside the waiver arguments, the fact that it was changed midstream during the hearing, and in fact, one, that Grandi's counsel, one, both conceded that the proposed construction that he had at the hearing was incorrect, and two, that he would ultimately give up any different construction when pressed by the Board. Even putting all of that aside, the Board went above and beyond any sort of due process that it owed to Grandi and still addressed the third modified construction that Grandi had offered on the merits in its decision and said, no, that's asking us to engraft what's essentially an embodiment, a preferred embodiment, this independent viewing system limitation that he's talked about today, that that's essentially an embodiment. And under well-established precedent of this Court, you don't read preferred embodiments into the claim limitations. And we think even if you got to the merits, which we don't think you need to, that the Board was completely correct in that under well-established circuit precedent and that that construction should not be disturbed. How do you respond to the argument made by the other side, at least appears to be made in the briefs, that the Board's construction, which is a little hard for me frankly to wrap my head around completely, but the Board's construction is vague and the way the Board actually applied it was to adopt your whole view, omnidirectional language, but without explicitly saying so. Sure. So a couple responses there and I'll get to the merits, but first of all, the vague argument, the vagueness argument, that's doubly waived. It was not only raised, not raised in their briefs, it was not raised in the hearing, it was not raised, as the Board noted, that argument was not even raised until the rehearing stage. So that's doubly waived. But even if we get past the waiver on the merits, Your Honor, the claim construction tracks the exact language from Grandi's own patent. And that language itself, we think, is self-contained. It's fine. Now the way in which they would help... What does it mean exactly? That's my problem. I've seen a lot of written descriptions that don't make a lot of sense until you parse it all out. So I think what it means is you sample enough of the real world images, essentially what's happening here is you're taking a camera, you're taking images of any scene like this room. You have a camera that pans 360 degrees, takes enough images so that when you render the image on a computer that you get a visual 3D, that you can get a 3D visual model. And that's the texture mapping. You take these two-dimensional images, which are taken from the camera. Let's say it takes 25 separate photos as it pans around. You then map those 25 two-dimensional images onto a three-dimensional spherical type object. So that's the second time you've used the word 3D, and that you think that it's used to make this 3D projection, but that's exactly the part of the claim construction your friend wanted to add in, and the board refused to add in, the part that it's sufficient to make a 3D representation. So aren't you defining the claim in the same way your colleague wants to? No, Your Honor. I think as... I don't want to speak for Mr. Chow, but as he himself said, the 3D graphic system, he himself called that a flawed interpretation. That's why he tried to change the interpretation at the hearing. He said that's from a different case. They had a different case. That's not an issue here, where they had that. He submitted that that actually was a preferred embodiment, and that is not part of it. So everyone here agrees that you add the standard 3D graphics viewing system. I'm just trying to describe in a practical sense how this invention works. So the sampling question is... That's what the full surround image data is for. That's not what it is. That's right. So the full surround image data are those pictures that are then mapped onto this visual model that you see on the computer screen. Now their argument, as I understand it, again it wasn't made below, so I'm trying to gather it from their briefs on their vagueness point is, well, you don't know how many pictures you need to take to do that. But we would think it's implicit in the definition of full surround image data that the user takes enough photos so that you can accomplish the objective of the invention, which is actually to map the images onto a real world, to create a real world image. Presumably a person of ordinary skill would either understand that it's enough pictures to accomplish this, or if no person of ordinary skill would understand that, it would be indefinite. Yes, your honor. I think that's exactly right. A person of ordinary skill would understand you have to take enough images to actually render the image in the real world. Anything more than that simply goes to resolution. If you take more pictures, more samples, you're going to get better resolution. And so we think it's completely implicit in the claims and the claims are in no way vague. So the prior art, and I know you're going to argue waiver, so let's put that aside. Sure. The question is, is the prior art taking full surround image data and texture mapping that, or does the prior art actually texture map slices and then overlay them, which would be different than full surround image data? Your honor, the photo VR does disclose texture mapping of full surround image data. Again, I'm going to put aside all the waiver arguments and just address the merits here. And so the way that photo VR describes it, it describes the texture mapping as part and parcel of an approach called a modified ray casting. Now the modified ray casting approach at photo VR essentially has two steps. The first step is you select a color from the image that is then texture mapped into the rendering. That color selection step in a traditional ray casting is easy. You just have a single image, you use that color, and then you map it onto the rendered image. In photo VR, they say to the extent some images might be overlapping, to pick that single color you have to average the two colors of the overlapped image. So if you have two overlapped images and they have slightly different coloration, it averages those colors. So that's the modified of the modified ray casting. So you average the color, and then you project that average color onto the polygon. That's the texture mapping. So it's two steps. Modified ray casting is really two steps. You do color averaging to the extent you have overlapping images, and then you map that color average onto the real world polygon. Now that, at the time that that image, that the color is averaged, you have full surround image data. And all you're then doing is applying the image onto the polygon, which is what texture mapping is. So even if you took it on their merits, their argument that you're not texture mapping. Is full surround image data a term of art in the field, or is it an invented term in this patent? Your Honor, it's a term of art in the sense that this technology was known before this patent. I think this patent provides a coined definition of full surround image data, but I think experts in the field would know what you're getting at if they read the prior art. Full surround has been used for an awfully long time. I'm sorry, Your Honor? I said full surround has been used for an awfully long time. Yes, Your Honor. Both the QuickTime VR, Photo VR, all predate the patents here. And just, Judge O'Malley, to close the loop on that, the texture mapping of full surround image data, the color averaging, if there's any doubt about substantial evidence, Grandi argues, oh, well this was just Google's council coming up with that this was a pre-processing step that you had the color averaging first. Well, you don't have to look any further than Grandi's own expert declaration, which appears at J.A. 1888, paragraph 47, where he calls Photo VR's ray casting a, quote, pre-processing step. So, Google's council, during the IPR hearing, didn't just make that up out of thin air. The exact phrase comes from Grandi's expert's declaration. And, of course, as the board found, it's a fair reading of Photo VR that you read modified ray casting to happen the two steps there are. There's certainly substantial evidence to support the board's finding, particularly under the circumstances here when the argument wasn't even raised until the oral argument. So the fact that Google's expert may not have specifically addressed this only comes from the fact that the argument wasn't made until the hearing itself. I want to address one thing before you sit down, but I was troubled by the fact that in response to the argument that the board didn't consider certain arguments or didn't expressly consider certain arguments, you fell back on the presumption of regularity that generally attaches to agency actions. Putting aside the fact that  presumption of regularity, it doesn't have anything to do with a substantive consideration of things. It has to do with mailings and those kinds of technical cases that you cite don't stand for. It was only meant to be an analogy that we should take the board had its word that it actually applied the claim construction that it found. There is nothing in the opinions at all to suggest that the board was offering one claim construction, but sub silentio applying a claim construction that it expressly rejected. There's simply no basis in any of the opinions that they cite to suggest that that's what the board was doing. I've never seen a court say that we're going to assume that a board or an adjudicative body was doing something other than what it says in the words in its opinions. There's nothing in the words of its opinions that suggests it's applying anything other than the claim construction that it adopted. So you can see that this has nothing to do with the ad law concept of presumption of regularity. Right, Your Honor. It was just a very loose analogy. We shouldn't assume that the board is doing something nefarious beyond what it says in its opinion or improper beyond what it says in its opinion. That's all the limited point was. The record is the record. Exactly. The record is the record. It did what it said in its opinion. It's clearly applied its claim construction. It rejected Google's proffered claim construction in the institution decision. It then applied the claim construction that it did. It found it anticipated per Google's arguments. And I just don't think that there's anything further. I know we're not supposed to really care about the allegedly infringing technology, but what applications does this technology have? There is another, for example, another district court litigation right now which alleges infringement to certain Google features such as the street view feature, which some in this room may have used, where you can pan around and see, for example, look at your house and your block. So I think that's the type of technology that would be at issue, for example, in that separate district court infringement litigation. Is that a parallel litigation to this? In other words, it's the same patents? It's the same patents. My understanding is there are also other patents and claims involved in that litigation. So the invalidity determination, if it's affirmed in this case, will substantially at a minimum, substantially narrow that district court litigation because there is a significant overlap in the claims in both cases. Self-driving car? Not that I know of. I don't think that would be implicated by these patents. There are no further questions. Thank you. Mr. Hell? Thank you, Your Honor. May it please the Court. I think the bounds of the due process argument have been pretty well laid out. I'd just like to point out once again that the issues were first crystallized in the petition when the board issued its institution decision that gave clear notice of what was going on in the case. There were a number of opportunities for Grand I to respond. Some of them it took. Some of them it didn't. For example, it did not give a preliminary response. It did not address claim construction. It declined to do so. You argue that one of the opportunities to make your claim construction argument more fulsome would be at the hearing. But the board takes a pretty strict view, does it not, of whether you can offer anything new at the hearing? Well, I think the board was skeptical of whether or not it could be raised at that point because at that point, if it's raised without notice, it prejudices the other side. It prejudices Google, is I think what the board was saying. Well, they're not skeptical. I mean, they take a policy position across the board that you can't raise anything new at the hearing, right? One of the judges took a fairly strong view or at least pushed back fairly strongly that it shouldn't be raised at that point in time. That doesn't mean that you can't. Maybe it's futile to do so, but you can maintain your position. You don't have to give it up at that point. And if the judge is wrong, the judge is wrong. That's an issue that you could appeal. But when you say, okay, I'm going to waive. I'm just going to waive my position. I'm not going to pursue that any longer. That's a different issue. But I'm not just talking about these judges. I'm talking about... This is not the first rodeo. I mean, we've seen a lot of cases coming out of the PTAB. And there are more. Yes, and a lot more are coming. And they all take the position that you can't raise anything new at the hearing. I mean, they have strict requirements. Is that not right? That's correct. Actually, that's in line with the rules. The rules allow the submission of evidence. So the evidence comes in during the initial phases. And by the time you get to the hearing, it's supposed to be pretty much closed. And so when you start taking new positions, that means the problem with that is that we have a one-year time period that we're supposed to complete this in. And if you're starting to raise new issues all of a sudden at the hearing at the very end, it makes it very difficult. Yeah, the real question seems to be what we're saying is whether it was new. If it's new, it's pretty clear. That's correct. So it was, I mean, definitely it was a new argument because the initial construction that was proffered had to do with folding in two different, it read in two different subsidiary definitions, what they call subsidiary definitions, I believe. And then at the hearing, the judge said, this is, I believe the quote was something along the lines of, this isn't even close to what it says in the specification. The specification gives us a definition for that term. Why don't we just use that? And when they tried to walk that back, the judge said, well, you can't pick and choose between these, your initial construction. You should have done it then. And I think that's fair. You get your chance. Right, they tried to walk it back to only incorporate one other limitation rather than two. That's right. And so I think the judges, I think as was mentioned, I think the judges did actually consider whether or not that was proper, whether or not it was proper to incorporate, further incorporate other things based upon as in the definition, there's a you can use it for, based upon the here's what you can use it for section of that portion of the specification. And they said no, we don't think, we think that's just an example of what the types of things you can use it for. His argument is that he was essentially forced to give up on his claim construction. I mean, you would agree, wouldn't you, that at some point a judicial officer could be so aggressive with respect to not allowing a development of an argument that there might be a due process violation. I think that's not the case here, but absolutely there are situations you can imagine. I think we could think of hypotheticals where you could have a due process problem, but that's not the case. But that's where you make an offer for the record. That's correct. That's correct. That's absolutely right. Due process just like anything else. Due process can be waived. This type of due process can be waived. And so if you waive it, then you've waived it. And certainly I think that's what happened in this case. And I don't think that the judges did anything incorrect in this case, but I certainly think that in this case it was waived as well. Do you have a view of exactly what that language from the specification needs with respect to the claim construction? We did not offer any view on that. I will just simply note that it appears that the specification has a definition and the claim language is the claim language, so I think that we of course think the Board did it correctly, but beyond that we don't offer any opinion in this case. Thank you very much, Your Honor. Mr. Chau, you have five minutes for rebuttal. Yes, I'd like to say that with respect to the full surround, there's no argument that it was a term of art. And in fact, if one thinks about full surround, you hear about it in OmniMax or other things like that. It's not necessarily 360 by 360. There's something in between. So the question is if you take that view it remains what would constitute full surround. The patents themselves describe a method of using two pictures with fisheye lenses, right? Yes. And how is that different? I mean, I don't understand how that's different from what the prior art disclosed. No, with the prior art, the Board made a determination that because we said that what OXL carefully determined was a way to combine two full surround image data to make one full surround image data, that because I admitted there always will be some tolerance, but the tolerance doesn't make any difference. Whereas in photo VR, it says explicitly in starting if you look at the whole document starting at A1249, which I commend to reading because this is the only evidence that is really given by Google. The prior art. I mean, what more evidence do they have to give? We can read the prior art. Yes, but the reading of this is that they focus on the assumptions on page 1250 and they say that because they consider the photo VR consider these viewpoints to all be in one place, even though they know they are not. The collection is not in one place. Now, if it's somewhat true for the two fisheyes, each fisheye will always have the same focal point or viewpoint. And then combining the two is relatively easy. It just makes sure that it's a distinct view of the world. What happens in photo VR is you're looking at 94 different worlds at different times. And the overlap means that you're even looking at the same object from a different angle, so it's actually a different view. That doesn't happen in the actual pattern. But the board simply said that because there's tolerance, therefore these were not meaningfully different. And there's tons of argument that goes with this. My argument on due process, which actually addresses some of what Guhu's counsel says, is that they were the ones who introduced the idea that there was some intermediate averaging that would constitute the And they raised that for the first time in a reply, saying that this information might be maintained. There's nothing that shows it's maintained anywhere. Our expert testified that there is no such maintenance, yet... But that's not raising the argument. I don't read that reply to contain the argument that you say was made. I mean, I see it for the first time raised by you at the hearing. The board asked me about intermediate data. So in a sense, they raised that. They took Guhu's idea of averaging as being the full surround image data and then asked me about it. And I said it wasn't. Then they said that, well, if the final result can it be considered full surround image data? I said yes, but for the fact that it was not acquired from the same viewpoint. So basically, what happens is that at the Just before you go on, let me clarify. So you're no longer talking about a due process violation with regard to the claim construction. You're talking with the due process violation about how somehow the way they got to the substantial evidence to support that there was texture mapping relied on a new argument that you didn't have a chance to respond to. It goes beyond that. What I'm really trying to figure out is whether you're giving up on the claim construction due process argument. Yes, I will do that. The construction is actually saying that the construction Do you feel I bullied you into doing that? No, not in that one. I would say just to simplify this, our argument on the claim construction is purely as a matter of law saying that sample without something else is not adequate to get construction. It needs some other kind of qualification. I think the board substantially used the whole room thing or the whole view thing. So why does the other due process argument really matter if the board didn't even rely on that alternative view of the world in reaching its conclusion? I think the other due process argument is that Google raised this intermediate thing, intermediate results and then the board questioned me about it and then questioned, actually helped Google decide that, well, is this texture mapped? Is this not texture mapped? If you read Google's rebuttal this is all attorney testimony. Well, they cite to your own expert. If you read the rest of it, our expert actually vehemently says that there's no texture mapping of the intermediate. I don't see how this is a due process argument. It seems to me you're quibbling with whether the board's reading of the evidence constitutes substantial evidence, but it doesn't sound to me like it's a due process argument. It did prevent us from rebutting, so we said that this is part of the rehearing and that they raised the issue and then said that we were the first one to raise the issue and Google was privileged to argue that there was some texture mapping after this intermediate result. Based upon the art that was already in the record there are just new arguments about stuff that was in the record. They didn't try to inject new evidence or anything like that. I think they did, but it's not because he's testifying. If you look at the... Who is testifying? Google's counsel. I didn't see anything in the record evidence. I think if you read the record it doesn't talk about the record. It talks about is there such a texture mapping. I think you've passed your time. Thank you. The case will be submitted.